UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

CASE NO.: 02-60942-CIV-MARRA/SELTZER

HARRINGTON BRASS WORKS )
LIMITED, INC., )
 )
       Plaintiff, )
 )
vs. )
 )
ROBERT COSOLITO, BC EURO )
DESIGNS INTERNATIONAL, INC. )
and MARGOT, S.A., )
 )
       Defendants. )
_____)

### ROBERT COSOLITO'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT (COUNT I)

### ROBERT COSOLITO'S CROSS-MOTION FOR SUMMARY JUDGMENT AS TO COUNT I WITH INCORPORATED MEMORANDUM OF LAW

Defendant, Robert Cosolito ("Cosolito"), by and through his undersigned attorneys, submits the following Memorandum of Law in opposition to the Motion for Partial Summary Judgment Against Cosolito filed by Plaintiff, Harrington Brass Works Limited, Inc. ("Harrington") ("Motion for Summary Judgment") and in support of Cosolito's Cross-Motion for Summary Judgment as to Count I ("Cross-Motion for Summary Judgment"):

**I.    INTRODUCTION**

Harrington's Motion for Summary Judgment rests primarily upon the enforceability of a clearly unenforceable provision in the Separation Agreement between Harrington and Cosolito, and upon several other faulty premises which are unsupported, and indeed, undermined, by the record evidence. In order to provide context to the subject dispute, a brief overview of the relationships between Harrington, Cosolito and Margot, S.A. ("Margot") is necessary.

117353.00601/50246546v1

A.   **The Relationship Between Harrington and Margot**

Harrington asserts, as an undisputed fact, that Harrington and Margot enjoyed an exclusive importing relationship from 1991 through June 2002. *See* Harrington's Motion for Summary Judgment, pp. 2, 4; Harrington's Statement of Uncontested Material Facts, ¶¶ 5, 11. Such an assertion is erroneous as a matter of law.[1]  Although it is true that Harrington and Margot entered into an exclusive importing agreement in 1991 (the "1991 Agreement"), whereby Harrington agreed to purchase and distribute Margot products in exchange for exclusivity, *see* Saperstein Transcript, 34:14-35:6, the parties entered into two later *non-exclusive* contracts in 1995 (the "1995 Agreement") and 1996 (the "1996 Agreement") whereby Harrington agreed to purchase and distribute Margot products in exchange for an assignment of certain Margot trademarks. *See* Saperstein Transcript, 35:20-37:23, 38:11-39:1.[2]  Harrington acknowledged that its duties under the 1991 Agreement were the same as its duties under the 1995 and 1996 Agreements. *See* Saperstein Transcript, 40:18-41:13.

As a matter of New Jersey law,[3] the exclusive 1991 Agreement was superceded by the non-exclusive 1995 and 1996 Agreements. *See, e.g.* In Re: Timberline Property Development, Inc., 115 B.R. 787, 790 (Bankr. D. N.J. 1990).  At a minimum, it is undisputed that both Margot

---

[1] The questions of whether Harrington and Margot had an exclusive relationship and, if so, when that exclusive relationship terminated are only tangentially relevant to the issues presented by way of Harrington's Motion for Summary Judgment and Cosolito's Cross-Motion for Summary Judgment. However, in order to evaluate the enforceability of the Separation Agreement and Harrington's claim of disparagement on the part of Cosolito, it is important for the Court to understand the history of the relationships between the parties and the state of affairs that existed at various times. The exact nature of Harrington's relationship with Margot, and of Cosolito's knowledge of such relationship, will be central to Harrington's tortious interference claim. Cosolito does not ask for the Court's ruling on the nature of the Harrington/Margot relationship at this time. The issue will be fully briefed by Cosolito at an appropriate time.

[2] Copies of the 1995 Agreement and 1996 Agreement are attached as Exhibits 3 and 4, respectively, to the deposition transcripts of Carol Saperstein and Jack Randolph. The deposition transcripts in this action will hereinafter be referred to as "Saperstein Transcript," "Randolph Transcript" and "Cosolito Transcript."

[3] All of the agreements involved in this case are expressly governed by the law of the state of New Jersey.

and Cosolito *believed* that the parties were operating under the 1995 and 1996 Agreements. *See* Cosolito Transcript, Exhibit 21 (Margot, relying upon a legal opinion obtained from New Jersey counsel, advised Cosolito that its relationship with Harrington was non-exclusive); Affidavit of Robert Cosolito, ¶3; Saperstein Transcript and Randolph Transcript, Exhibit 5; Saperstein Transcript, 42:23-43:13, 44:10-14 (Harrington acknowledged that Margot thought the non-exclusive 1995 and 1996 Agreements were the operative agreements); Randolph Transcript, 41:9-42:14, 45:15-46:3 (same).

The questions of whether Margot and Harrington had an exclusive arrangement and, if so, when such relationship ended, were recently presented to the United States District Court for the District of New Jersey in a suit brought by Margot against Harrington to recover for unpaid invoices (Civil Action No.: 02-CV-5514). Harrington counterclaimed in that action for, *inter alia*, breach of the 1991 Agreement, and Margot denied that such agreement governed the parties' relationship. The case is still in the pleading stage. True copies of the Complaint, Amended Answer and Counterclaim, and Answer to Counterclaim are included within Cosolito's Appendix as Exhibits "A," "B" and "C," respectively.[4] District courts may take judicial notice of public records. Jackson v. Bellsouth Telecommunications, Inc., 181 F.Supp.2d 1345, 1353 (S.D. Fla. 2001).

### B.  The Relationship Between Harrington and Cosolito

Cosolito was employed by Harrington until February 6, 2000. *See* Saperstein Transcript and Randolph Transcript, Exhibit 15; Saperstein Transcript, 124:14-125:13. On March 3, 2000, nearly a month after his termination, Cosolito executed a Separation Agreement whereby he

---

[4] Insofar as the existence of the 1991 Agreement and Margot's breach thereof are essential elements of Harrington's tortious interference claim (but not its claim for breach of the separation agreement), Cosolito may later seek an abatement of this action to permit the New Jersey court, with both parties to the 1991 Agreement before it, to decide those issues, rather than have this Court determine such issues with only one party to the 1991 Agreement before it.

agreed, *inter alia*, not to communicate with Margot for a period of 18 months and not to disparage Harrington. *See* Saperstein Transcript and Randolph Transcript, Exhibit 15. Cosolito's future employment by Harrington was not contemplated at that time, and Cosolito, in fact, never returned to work for Harrington. *See* Saperstein Transcript, 126:29-127:4.

### C.   The Demise of the Harrington/Margot Relationship

Long before Cosolito was terminated, Margot wrote to Harrington and expressed, in no uncertain terms, that due to its longstanding personal and professional relationship with Cosolito, it would feel uncomfortable continuing its relationship with Harrington if Cosolito were no longer a part of the company.[5] *See* Saperstein Transcript and Randolph Transcript, Exhibit 8. Following Cosolito's termination in February 2000, Margot could have terminated its relationship with Harrington at any time, for any reason, or for no reason at all, pursuant to the termination provisions of the various agreements.[6] Margot elected not to do so and, indeed, continued its relationship with Harrington for over 2 years. Soon after Cosolito's termination, however, the relationship showed signs of strain.

Between September 27, 2000 and November 28, 2000 (long before any communication between Cosolito and Margot), *see* Harrington's Statement of Undisputed Material Facts, ¶8 (communications occurred between April 30, 2001 and August 29, 2001), Margot and Harrington had a series of disputes regarding Harrington's failure to make payment and Margot's general lack of confidence in Harrington's management and direction. *See* Saperstein Transcript and Randolph Transcript, Composite Exhibit 7. In February 2001 (before any communication

---

[5] Cosolito's relationship with the principals of Margot began during his prior employment with Davis and Warshow and predated his employment with Harrington. Indeed, it was Cosolito who introduced Harrington to Margot. *See* Cosolito Transcript, 155:4-156:2; Affidavit of Robert Cosolito, ¶2.

[6] All of the agreements permitted Margot to terminate without cause. The 1991 Agreement required 6 months' notice of termination. The 1995 and 1996 Agreements required 12 months' notice.

between Cosolito and Margot), Margot proposed a new contract to Harrington which would govern the parties' relationship in the future. *See* Saperstein Transcript and Randolph Transcript, Composite Exhibit 9. Rather than accept, or make revisions to, the proposed contract, in May 2001, Harrington provided Margot with an entirely different proposed contract. *See* Saperstein Transcript and Randolph Transcript, Exhibit 24.

On June 20, 2001, Margot, having received Harrington's proposed contract, and determined that there was a "real dissension about the principles of [their] relationship," terminated *the non-exclusive "1995 and 1996 Agreements"* in accordance with the 12-month notice provisions provided under those agreements. *See* Saperstein Transcript and Randolph Transcript, Exhibit 5; *see also* Randolph Transcript, 41:9-42:14.[7] Margot indicated that it was still willing to do business with Harrington under the terms suggested by Margot, and specifically left its offer open for 30 days. Harrington never accepted the offer.

On July 5, 2001, Margot informed Cosolito for the first time that it had terminated its relationship with Harrington. *See* Cosolito Transcript, 170:22-171:2. On July 14, 2001, Margot further explained to Harrington the reasons it terminated the relationship. *See* Saperstein Transcript and Randolph Transcript, Exhibit 19. In September 2001, while continuing to supply products to Harrington, Margot began also supplying products to Cosolito's company, BC Euro Designs International, Inc. ("BC Euro"), pursuant to an understanding reached between Cosolito

---

[7] Plaintiff's assertion that, by this June 20, 2001 letter, Margot terminated the 1991 Agreement, *see* Harrington's Statement of Undisputed Material Facts, ¶11, is simply a misrepresentation of the evidence. Margot clearly specified that it was terminating the 1995 and 1996 Agreements and provided the 12-month notice of termination called for under those agreements. Harrington curiously seems to contend that, although the 1991 Agreement (which provided for only 6-months' notice of termination) governed the parties' relationship, Margot is still bound by the 12-month notice provision contained in the 1995 and 1996 Agreements. *See* Randolph Transcript, 39:4-24. Either the 1991 Agreement governed and Harrington was entitled to 6 months' notice of termination, or the 1995 and/or 1996 Agreements governed and Harrington was entitled to 12 months notice of termination. Harrington cannot have it both ways.

and Margot following Cosolito's termination, but prior to the execution of the Separation Agreement. *See* Cosolito Transcript, 164:5-165:14;127:18-25; 130:12-19; 154:21-155:3.

In September 2001, Harrington filed suit against Cosolito and Margot in the Superior Court of New Jersey, Law Division, Bergen County (Docket No.: BER-L-8069-01) seeking enforcement of the 1991 Agreement and to enjoin Margot from exporting products into the United States until June 20, 2002.[8] Later in 2001, Harrington unsuccessfully sought an identical preliminary injunction against Cosolito and Margot in the United States District Court for the District of New Jersey (Civil Action No.: 2:01-CV-5185). Some time thereafter, Harrington sued Margot in France and, eventually, the French appellate court decided that it would not disturb the New Jersey court's ruling that Harrington was not entitled to the relief sought.[9] [10]

Despite these lawsuits, Margot continued to supply Harrington with product through May 7, 2002.[11] Beginning on April 12, 2002, Margot and Harrington became embroiled in another dispute concerning payment and payment terms.[12] *See* Saperstein Transcript and Randolph Transcript, Composite Exhibit 12. On May 7, 2002, Margot, citing to the failure of the parties to reach an agreement on payment terms, and the persistent lawsuits being filed against it, advised Harrington that it would stop deliveries as of that date, but would still accept returns. *See* Saperstein Transcript and Randolph Transcript, Composite Exhibit 12. On May 14, 2002,

---

[8] Copies of the Complaint, Order to Show Cause, First Amended Complaint and Answer thereto are included within Cosolito's Appendix as Exhibits "D," "E," "F" and "G," respectively.

[9] A translated copy of the French court ruling is included within Cosolito's Appendix as Exhibit "H."

[10] These lawsuits are set forth only for the purpose of explaining the context of Margot's eventual decision to stop supplying Harrington. Cosolito does not contend that any of these ruling have preclusive effect on the instant proceedings. Indeed, the undersigned is not in possession of all of the pleadings related to these lawsuits and, at least with regard to the New Jersey state court action, has not determined how that action concluded.

[11] Assuming the 1991 Agreement controlled, Margot's obligation to supply Harrington expired on December 20, 2001 pursuant to the June 20, 2001 termination notice and the 6-month termination provision set forth in the 1991 Agreement.

[12] The various agreements contemplated that the parties would negotiate new terms from time to time.

Margot made demand upon Harrington for unpaid invoices in the amount of $50,938.59. *See* Saperstein Transcript and Randolph Transcript, Composite Exhibit 13; *see also* Randolph Transcript, 87:11-22, 93:8-94:9 (Margot is alleging in its New Jersey lawsuit that Harrington breached the parties' agreement by failing to pay invoices). Also on May 14, 2002, Margot advised the world that it stopped delivering to Harrington and that Cosolito's company, BC Euro Designs International, Inc. ("BC Euro"), would be its exclusive distributor. *See* Cosolito Transcript, Exhibit 32.

## II.  THE SEPARATION AGREEMENT IS UNENFORCEABLE TO THE EXTENT IT PROHIBITS COSOLITO FROM COMMUNICATING WITH MARGOT

Insofar as Harrington seeks to enforce the covenant contained within the Separation Agreement prohibiting Cosolito from communicating with Margot, summary judgment must be entered in favor of Cosolito, and against Harrington, because such a restrictive covenant is unenforceable under New Jersey law.[13] As in most other states, restrictive covenants having the effect of stifling competition are disfavored and unenforceable with limited exceptions. *See* N.J. Stat. §56:9-3 ("Every contract... in restraint of trade or commerce, in this State, shall be unlawful."); Maw v. Advanced Clinical Communications, Inc., 820 A.2d 105 (N.J. Super. Ct. App. Div. 2003). Non-communication or non-solicitation clauses fall within the "restrictive covenant" rubric and must meet certain conditions to be enforceable. Hogan v. Bergen Brunswig Corp., 378 A.2d 1164 (N.J. Super. Ct. App. Div. 1977); IKON Office Solutions, Inc. v. Belanger, 59 F.Supp.2d 125 (D. Mass. 1999) (applying Massachusetts law which is identical to New Jersey law); W.R. Grace & Co. v. Mouyal, 422 S.E.2d 529 (Ga. 1992); Gill v. Poe & Brown of Georgia, Inc., 524 S.E.2d 328 (Ga. Ct. App. 1999).

---

[13] Paragraph 14 of the Separation Agreement provides that the agreement "shall be construed and governed for all purposes in accordance with the laws of the state of New Jersey without regard to principles of conflict of laws."

Under New Jersey law, restrictive covenants will only be enforced when two tests are met. First, the restrictive covenant must be "ancillary to" the employment relationship. If it is, then it is enforceable only if it is reasonable under all of the circumstances. The restrictive covenant at issue here fails both of these tests, as discussed below.

### A.   The Restrictive Covenant Was Not Ancillary To Cosolito's Employment

In order to be enforceable, a restrictive covenant given by an employee must be ancillary to the employment relationship, meaning that *the consideration given for the restrictive covenant must be, at least in part, new employment or the continuation of employment.* Hogan v. Bergen Brunswig Corp., 378 A.2d 1164, 1167 (N.J. Super. Ct. App. Div. 1977), *citing* Sarco Co. of New Jersey v. Gulliver, 129 A. 399 (N.J. Ch. 1925); Guttridge, Inc. v. Wean, 73 A.2d 284 (N.J. Ch. 1950); Credit Rating Service, Inc. v. Charlesworth, 8 A.2d 847 (N.J. Ch. 1939); "Non-Competition Clauses," 51 A.L.R.3d 825, 835 (1973); Blake, "Employee Agreements Not To Compete," 73 Harv.L.Rev. 625, 629, n.1 (1960); *see also* Heuer v. Rubin, 62 A.2d 812, 814 (N.J. 1949); "Continued Employment As Independent Consideration," 54A Am.Jur.2d Monopolies and Restraints of Trade §898 (2003). The payment of money is simply not "good and sufficient consideration" to support a restrictive covenant. Hogan, 378 A.2d at 1167.[14]

In this case, the Separation Agreement was not executed until a month after Cosolito's employment was terminated. *See* Saperstein Transcript and Randolph Transcript, Exhibit 15; Saperstein Transcript, 124:14-125:13. There was no continued employment given in exchange for the covenant, *see* Saperstein Transcript, 126:29-127:4, and thus, the covenant is unenforceable. *See* "Non-Ancillary Restraints On Competition," RESTATEMENT (SECOND) OF

---

[14] Even if money were sufficient, Harrington admits, and alleged in the New Jersey action, that the money paid to Cosolito was in exchange for a waiver of all claims which Cosolito had against Harrington, not in exchange for the restrictive covenant. *See* Saperstein Transcript, 134:6-13.

CONTRACTS §187, cmt. b (1981) ("A promise made subsequent to the [employment relationship] is not ancillary to it").

### B. The Restrictive Covenant Is Not Reasonable Because It Does Not Protect Legitimate Interests Of Harrington

A restrictive covenant given in consideration for employment will be given effect only if it is reasonable under the circumstances, meaning that it protects the legitimate interests of the employer, imposes no undue hardship on the employee and is not injurious to the public. Hogan, 378 A.2d at 1166; *see also* Whitmyer Bros., Inc. v. Doyle, 274 A.2d 577, 581 (N.J. 1971); Maw v. Advanced Clinical Communications, Inc., 820 A.2d 105, 113 (N.J. Super. Ct. App. Div. 2003). Even if Cosolito's promise to refrain from communicating with Margot were ancillary to his employment, which it clearly was not, the covenant would still be unenforceable because it does not protect the legitimate business interests of Harrington, but rather, serves only to stifle competition.

An "employer has no legitimate interest in preventing competition as such." Whitmyer, 274 A.2d at 581; Maw, 820 A.2d at 113. Courts must "carefully scrutinize the interests asserted by the employer before the non-compete is determined to be reasonable and enforceable." Maw, 820 A.2d at 114. "When an employer's interests are strong, as seen in cases involving trade secrets or confidential information, a court will enforce a restrictive covenant; however, when the employer's interests 'do not rise to the level of a proprietary interest deserving of judicial protection, a court will conclude that a restrictive covenant merely stifles competition and therefore is unenforceable.'" Maw, 820 A.2d at 113, *quoting* Ingersoll-Rand Co. v. Ciavatta, 542 A.2d 879 (N.J. 1988).

In this case, Harrington acknowledges that the very purpose of the provision prohibiting Cosolito from communicating with Margot was to prevent Cosolito from competing with

Harrington. *See* Saperstein Transcript, 128:21-129:7. Harrington's admission establishes that the provision is unenforceable as a matter of law. Whitmyer, 274 A.2d at 581; Maw, 820 A.2d at 113.

Moreover, Harrington does not allege that its relationship with Margot was proprietary or confidential, and the evidence establishes that it was not, either generally, or specifically as to Cosolito. If the employer does not have "a proprietary interest *vis-a-vis [the employee]* worthy of judicial protection... the non-compete covenant's effect may be principally directed at lessening competition, which the courts of [New Jersey] have recognized as injurious to the public." Maw, 820 A.2d at 115 (emphasis supplied). Cosolito knew Margot long before he became employed by Harrington. Indeed, he was the person who introduced Harrington to Margot. *See* Cosolito Transcript, 155:4-156:2; Affidavit of Robert Cosolito, ¶2. The "knowledge... an employee brought with him to the employer [is] not worthy of protection through a non-competition agreement." Maw, 820 A.2d at 114; *see also* Meadox Medicals, Inc. v. Life Systems, Inc., 3 F.Supp.2d 549, 553 (D.N.J. 1998) ("What an employee brings to his employer, he should be able to take away."); Coskey's Television & Radio Sales and Service, Inc. v. Foti, 602 A.2d 789, 795 (N.J. Super. Ct. App. Div. 1992) (An employee who brought his relationships with him to his employment could not be precluded from using his contacts by way of a restrictive covenant.).[15]

In addition, Harrington's relationship was not treated as confidential by Harrington, and was generally known within the industry. "[M]atters of general knowledge within an industry... are not worthy of protection through a non-competition agreement." Maw, 820 A.2d at 114.

---

[15] This Court has already once ruled that information with which a party is already familiar "cannot be deemed confidential or privileged" as to that party. *See* Order On Plaintiff's Motion To Compel Discovery From Defendants, p.4, *citing* Blackstone v. Dade City Osteopathic Clinic, 511 So.2d 1050, 1051 (Fla. 2nd DCA 1987).

Harrington publicly touted its relationship with Margot by placing Margot's name on the boxes shipped to its customers and by introducing Margot to its customers at various trade shows as its manufacturer. *See* Affidavit of Robert Cosolito, ¶4; Randolph Transcript, 48:16-49:4. Additionally, the trade association governing the bathroom fixture industry, IAPMO, was aware of the relationship and noted the name of Harrington's manufacturer on its correspondence and inspection reports. *See* Saperstein and Randolph Transcript, Exhibit 16; Saperstein Transcript, 135:19-137:11. Finally, Harrington's own claims of disparagement rest upon the notion that its customers knew that Margot was its manufacturer. Cosolito is mainly alleged to have told Harrington's customers things such as that "Margot was no longer distributing product to [Harrington]," a reference that would be lost on customers who did not already know who Margot was. *See* Harrington's Statement of Uncontested Material Facts, ¶16, 17, 18, 19, 21, 22, 23, 24, 25, 26, 27, 28, 29 and 30.

> C. **Harrington Suffered No Harm As A Result Of The Communications Between Cosolito and Margot During The Restricted Period**

Harrington alleges in section I(C) of its Motion for Summary Judgment that it suffered harm as a result of Cosolito's communications with Margot during the restricted period. It implies, in conclusory fashion, that the communications between Cosolito and Margot during the restricted period must have caused Margot to begin using BC Euro as its distributor. There is no evidence to support such an assertion. Indeed, the only record evidence is that Cosolito agreed with Margot, following his termination *but before he entered into the Separation Agreement*, that he and Margot would do business with one another when they were able. *See* Cosolito Transcript, 164:5-165:14; 127:18-25; 130:12-19; 154:21-155:3. This was prior to the so-called "restricted period" and was in no manner unlawful. Because Cosolito and Margot had already decided, before the Separation Agreement was executed, that they would do business with one

another when they were able, any communications between Cosolito and Margot during the restricted period were immaterial, and did not cause the harm alleged by Harrington.

### III. HARRINGTON'S DISPARAGEMENT CLAIM

Harrington asserts, as a second breach of the Separation Agreement, that Cosolito made disparaging statements to Harrington's customers. As a matter of law, most of the statements identified by Harrington could not be considered "disparaging," and the record evidence reveals that no disparaging statements were made. Moreover, Harrington has admittedly suffered no harm as a result of any disparaging statement.

The Separation Agreement provides, in relevant part, that Cosolito "will not disparage or make any negative statements to anyone... or do anything that denigrates [Harrington], or its services, reputation, officers, employees, financial status or operations or which damage [Harrington] in any business relationship." *See* Separation Agreement, ¶5. Harrington, apparently construing this provision as prohibiting Cosolito from doing anything which would cause Harrington to lose business, such as competing with Harrington, identifies 12 statements allegedly made by Cosolito to specific recipients, *see* Harrington's Statement of Undisputed Material Facts, ¶¶ 16-27, and 3 statements made by Cosolito to unidentified "Harrington customers." *See* Harrington's Statement of Undisputed Material Facts, ¶¶ 28-30.

#### A. Most Of The Statements Identified By Harrington Are Not Disparaging

"Disparagement" means "diminution in esteem or standing and dignity; disgrace..., the expression of a low opinion of something; detraction..." City Group, Inc. v. Ehlers, 402 S.E.2d 787, 788 (Ga. Ct. App. 1991), *quoting* Webster's Third New Int'l Dictionary (1961). "Denigrate" means "to cast aspersions on." Webster's Ninth New Collegiate Dictionary (1983). The majority of statements identified by Harrington do not come close to meeting these definitions; they do not even speak to the reputation of Harrington. The non-disparaging

statements identified by Harrington, *all of which were true at the time they were made* (*see* §I(C) above), are as follows:

 (i) Cosolito told a customer "that Margot was no longer delivering products to [Harrington]," *see* Harrington's Statement of Undisputed Material Facts, ¶16;

 (ii) Cosolito's representative, Steve Toor, told a customer "that [BC Euro] would be carrying the Margot products," *see* Harrington's Statement of Undisputed Material Facts, ¶18;

 (iii) Cosolito stated that BC Euro "would be taking on the distribution of the Margot products in the United States," *see* Harrington's Statement of Undisputed Material Facts, ¶19;

 (iv) Cosolito told a customer that if he "had any problems with getting [Margot] product from Harrington, give me a call and I'll see if I can help you out," *see* Harrington's Statement of Undisputed Material Facts, ¶20;

 (v) Cosolito told a customer that "we were told by Margot that they weren't going to be shipping any more product to Harrington," *see* Harrington's Statement of Undisputed Material Facts, ¶21;

 (vi) Cosolito told a customer that "Harrington wasn't getting Margot product shipped to them, and that if he had any difficulty getting product, and if he needed, give me a call," *see* Harrington's Statement of Undisputed Material Facts, ¶22;

 (vii) Cosolito told a customer that "Margot had canceled its contract with [Harrington] and was no longer shipping product to [Harrington]," *see* Harrington's Statement of Undisputed Material Facts, ¶23;

 (viii) Cosolito told a customer that Harrington "was not getting any more shipments or receiving Margot products," *see* Harrington's Statement of Undisputed Material Facts, ¶24;

 (ix) Cosolito told a customer that "Margot's contract with Harrington had ended and that [the customer] could buy Margot products from him," *see* Harrington's Statement of Undisputed Material Facts, ¶25

 (x) Cosolito told a customer that BC Euro was "going to have the Margot products, and that [BC Euro] would be distributing them," *see* Harrington's Statement of Undisputed Material Facts, ¶26;

(xi) Cosolito told a customer that "BC Euro was the new distributor for Margot products," *see* Harrington's Statement of Undisputed Material Facts, ¶27;

(xii) Cosolito told "[Harrington] customers"[16] that "Margot's contract with [Harrington] was going to end," *see* Harrington's Statement of Undisputed Material Facts, ¶28; and

(xiii) Cosolito recommended to [Harrington] customers that they fax their orders for Margot products to BC Euro," *see* Harrington's Statement of Undisputed Material Facts, ¶29.

These statements do not serve to disgrace or cast aspersions upon Harrington; rather, they merely accurately communicate the then-current state of affairs as acknowledged by all parties. *See* §IC above. Harrington, apparently construing the contractual provision as a blanket prohibition against Cosolito's solicitation of its customers,[17] emphasizes that Cosolito knew that the recipients of the statements were Harrington customers. *See* Harrington's Statement of Undisputed Material Facts, ¶¶ 18, 19, 26 and 27. However, the provision, given such a broad construction, would be an unenforceable restraint of trade under New Jersey law for the reasons set forth in §II above, and would be contrary to the plain language of the agreement prohibiting only "disparagement" or "denigration." As to the above-listed statements, summary judgment must be entered in favor of Cosolito because "there is no reasonable interpretation of the comments attributed to [Cosolito] which could be considered disparaging." City Group, 402 S.E.2d at 788 (awarding summary judgment in the context of a non-disparagement provision).

B.   **There Is No Record Evidence That Disparaging Statements Were Made; The Record Evidence Establishes That No Such Statements Were Made**

The only arguably disparaging statements identified by Harrington are as follows: (i) Cosolito told Dale Landy of Kolsen Korenge that "[Harrington] had bounced checks to Margot,

---

[16] These "customers" have not been identified.

[17] The Separation Agreement does not purport to prohibit Cosolito from soliciting Harrington's customers.

and that Margot had placed [Harrington] on a credit hold," *see* Harrington's Statement of Undisputed Material Facts, ¶16; and (ii) Cosolito told Studio Il Bagno that "[Harrington] was not paying [Margot]." *See* Harrington's Statement of Undisputed Material Facts, ¶17.

Harrington did not file any affidavits in support of its Motion for Summary Judgment to establish that the statements to Kolsen Korenge and Studio Il Bagno were, in fact, made. Rather, it cites solely to Cosolito's deposition transcript (Exhibit C to Harrington's Appendix) to support its contentions. A review of the cited portions of Cosolito's transcript, however, reveals that Cosolito denied, or had no recollection of, making the disparaging statements identified by Harrington. *See* Cosolito Transcript, 40:10-41:1, 19:10-21:3; *see also* Affidavit of Robert Cosolito, ¶6 (explaining Harrington's misunderstanding of his deposition testimony). Because there is no record evidence that these disparaging statements were made, summary judgment in favor of Cosolito must be granted.

Moreover, at her deposition, Harrington's president, Carol Saperstein, based upon detailed notes she took at or around the time the alleged statements were made, *see* Saperstein Transcript and Randolph Transcript, Composite Exhibit 11, recalled entirely different, and innocuous, statements made to Kolsen Korenge and Studio Il Bagno. Ms. Saperstein testified that Cosolito merely told Kolsen Korenge that Margot was going to stop distributing product to Harrington around June 2002, a statement which Ms. Saperstein acknowledged was completely truthful and accurate. *See* Saperstein Transcript, 79:18-83:21. No mention was made of any statement regarding bounced checks or a credit hold. Similarly, when reviewing internal Harrington notes regarding Studio Il Bagno, Ms. Saperstein made no mention of any statement by Cosolito regarding Harrington's failure to make payment to Margot, as is now alleged. *See* Saperstein Transcript, 110:24-112:18; *see also* Cosolito Transcript, Exhibit 2 (HBW0250)

(internal Harrington memo recounting Cosolito's alleged statement to Studio Il Bagno).[18] Therefore, summary judgment in favor of Cosolito is warranted based upon the record evidence.

Finally, Cosolito denies making these disparaging statements, creating, at a minimum, a question of fact. *See* Affidavit of Robert Cosolito, ¶¶ 5-7.

### C. Harrington Admittedly Suffered No Harm As A Result of The Disparaging Statements

Even if there were record evidence to support that disparaging statements were made, which there is not, summary judgment must be denied in favor of Harrington, and granted in favor of Cosolito, because Harrington admittedly suffered no damages as a result of the alleged statements. On July 29, 2003, Harrington served its Response to Cosolito's First Set of Interrogatories in which it identified all disparaging statements then known to it, and all damages alleged to have been suffered as a result of such statements. *See* Plaintiff's Response to Robert Cosolito's First Set of Interrogatories, ¶¶ 14, 16 and 17 (attached as Exhibit 14 to Saperstein Transcript and Randolph Transcript). Although Harrington knew about and identified 19 alleged statements, it alleged only three instances of damages as a result of the statements, none of which correlated with any "disparaging statement."

According to Harrington, the only customers that were allegedly affected by the statements were Brian Ackerson (of DT Plumbing or DT Baths Plus), Ferguson Enterprises and

---

[18] Harrington also swore to an entirely different, and innocuous, statement to Studio Il Bagno in its Answers to Interrogatories filed on July 29, 2003. *See* Plaintiff's Response to Robert Cosolito's First Set of Interrogatories, ¶14(a) (Plaintiff's Response is attached as Exhibit 14 to the Saperstein Transcript and Randolph Transcript). In its answer, Harrington alleged that Cosolito communicated with Studio Il Bagno, but did not allege that Cosolito made any statements to Studio Il Bagno regarding Harrington's failure to make payment.

R.K. Miles. *See* Plaintiff's Response to Robert Cosolito's First Set of Interrogatories, ¶17.[19] Neither Kolson Korenge nor Studio 11 Bagno (the only parties to whom arguably disparaging statements were made, *see* §III(B) above) altered their relationship with Harrington in any manner. Id. Thus, there is no instance in which an alleged disparaging statement coincides with an allegation of harm, as is required to support Harrington's claim for breach of contract, and summary judgment must be entered against Harrington, and in favor of Cosolito, for that reason too.

## IV. CONCLUSION

Harrington has alleged two distinct breaches of the Separation Agreement – breach of the non-communication provision and breach of the non-disparagement provision. Summary judgment must be entered in favor of Cosolito with regard to the non-communication provision because such a provision is unenforceable. Summary judgment must also be entered in favor of Cosolito on the non-disparagement claim because the statements were not disparaging as a matter of law, there is no record evidence that any disparaging statements were made, and Harrington suffered no harm as a result of any disparaging statement. At a minimum Harrington's request for summary judgment must be denied because there are fact questions regarding what statements were made and whether damages were suffered as a result.

---

[19] The alleged statements made to these affected customers were non-disparaging. DT Plumbing (or DT Baths Plus) was told that BC Euro "would be carrying the Margot products." *See* Harrington's Statement of Undisputed Material Facts, ¶18. R.K. Miles, was told that if R.K. Miles "had any problems with getting product from Harrington, give me a call and I'll see if I can help you out." *See* Harrington's Statement of Undisputed Material Facts, ¶20. Harrington does not cite to any statement to Ferguson's Enterprises in its Motion for Summary Judgment or its Statement of Undisputed Material Facts.

Respectfully submitted,

BLANK ROME LLP
Attorneys for Robert Cosolito and BC Euro
1200 North Federal Highway, Suite 417
Boca Raton, Florida 33432
(561) 417-8100 Telephone
(561) 417-8101 Facsimile

By: _____
Howard M. Camerik
Florida Bar No. 703435
Steven A. Lessne
Florida Bar No. 107514

### CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished by U.S. Mail this 20th day of October, 2003 to: Wilton H. Strickland, Esq., Greenberg Traurig, P.A., 1221 Brickell Avenue, 20th Floor, Miami, Florida 33131.

_____